**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

               Plaintiff,

v.                                       Crim. No. 18-00930 MV

MARIAH FERRY,

               Defendant.


**MEMORANDUM OPINION AND ORDER ON DEFENDANT'S EMERGENCY**
**MOTION FOR REVOCATION OR AMENDMENT OF ORDER OF DETENTION**

**THIS MATTER** is before the Court on Defendant Mariah Ferry's Opposed Emergency Motion for Revocation or Amendment of Order of Detention [Doc. 235]. The government responded [Doc. 239] and Ms. Ferry replied [Doc. 247]. The Court, having considered the motions, exhibits, relevant law, and being otherwise fully informed, finds that the motion is not well-taken and will be **DENIED**.

**BACKGROUND**

Mariah Ferry was indicted on March 28, 2018, on charges of Kidnapping and Conspiracy to Kidnap. Doc. 2. The government moved to detain her. Doc. 12. On April 4, 2018, she waived her detention hearing [Doc. 15] and was remanded to the custody of the United States Marshals Service [Doc. 16].

On February 13, 2020, Ms. Ferry pled guilty pursuant to a Plea Agreement [Doc. 229] to Counts 1 and 3 of the Second Superseding Indictment [Doc. 117], which charged Conspiracy to Kidnap, in violation of 18 U.S.C. § 1201(c), and Kidnapping, in violation of 18 U.S.C. § 1201(a)(1). Ms. Ferry's Plea Agreement was entered pursuant to Rule 11(c)(1)(C) of the Federal

1

Rules of Criminal Procedure. Doc. 229 at 1. Under the agreement, Ms. Ferry has agreed to serve a sentence of not less than 30 years and not more than 40 years of imprisonment. *Id*. at ¶ 11(a).

In the Plea Agreement, Ms. Ferry specifically admitted certain facts, including the following, which transpired in August of 2017. *See id*. at ¶ 9. Ms. Ferry and her boyfriend, Chase Smotherman, learned that Mr. Smotherman's home had been burglarized and that his money and marijuana had been stolen. *Id*. Mr. Smotherman informed Ms. Ferry that he received information from an acquaintance named Jose Torrez that two individuals–M.T. and J.S.–had committed the burglary. *Id*. Ms. Ferry was aware that Mr. Smotherman asked Mr. Torrez to inform him if M.T. and J.S. returned to Mr. Torrez's garage, where they resided, because Mr. Smotherman sought to inflict significant bodily harm on J.S. and M.T. in order to teach them a lesson about stealing from Mr. Smotherman, while also intending to recover drugs and/or money. *Id*.

In the early morning hours of August 8, 2017, Mr. Torrez sent Mr. Smotherman a text message stating that J.S. had arrived at the garage, and that Mr. Smotherman could come by to harm J.S. *Id*. Ms. Ferry drove Mr. Smotherman to the garage, where Mr. Smotherman confronted J.S. and beat him multiple times with a baseball bat. *Id*. Ms. Ferry gathered J.S.'s personal effects and placed them in her car. *Id*. J.S. was then placed in the trunk of Ms. Ferry's car, with his hands, ankles, and mouth bound with tape. *Id*. Ms. Ferry drove with Mr. Smotherman and J.S. to the home of another co-conspirator. *Id*. Once they arrived there, Ms. Ferry assaulted J.S. as he lay bound and badly beaten in the trunk of her car by striking his legs with the blunt end of an axe. *Id*. Shortly thereafter, while bound in the trunk of Ms. Ferry's car, J.S. died. *Id*. With Mr. Smotherman's assistance, Ms. Ferry subsequently mutilated J.S.'s body in a nearby shed. *Id*.[1]

---

[1] The government provides further detail about the mutilation of J.S.'s body: "video clips reveal that after his death, J.S. was gruesomely dismembered by the defendant. The videos reveal the defendant sliced open the neck of J.S., as well as his chest cavity. She severed his penis and stuck it in his mouth and in the neck wound she inflicted, and cut of his nipples, placing them over his eyes. She then gouged his eyes out." Doc. 239 at 13.

Later that day, Mr. Smothermon contacted M.T., asking to purchase marijuana from him. *Id*. This was a ruse to get M.T. to come to Mr. Smothermon's home – where Ms. Ferry resided with Mr. Smothermon at the time – and where Ms. Ferry and Mr. Smothermon intended to inflict bodily harm upon M.T. and to recover Mr. Smothermon's drugs. *Id*. As soon as M.T. entered the home, Ms. Ferry, along with Mr. Smothermon and others, assaulted, bound, gagged, and tortured M.T. for several hours. *Id*. M.T.'s hands, ankles, and mouth were bound with zip ties and duct tape. *Id*. During M.T.'s confinement, Ms. Ferry and others showed M.T. a picture of J.S., who was deceased, and threatened to do the same to M.T. unless he revealed the location of Mr. Smothermon's drugs. *Id*. M.T. was subsequently driven by another co-conspirator and his girlfriend to their home and forced to stay there overnight, but was released the next morning without further physical harm. *Id*.

On the evening of August 9th, 2017, Ms. Ferry drove Mr. Smothermon and another co-conspirator in Mr. Smothermon's pickup truck – with J.S.'s body in the bed of the truck – to a rural area in New Mexico, where J.S. was buried in a shallow grave. *Id*. Ms. Ferry coordinated with others to clean up the garage where J.S. was beaten and kidnapped, to clean Mr. Smothermon's home where M.T. was beaten and kidnapped, and to clean up the shed where she and Mr. Smothermon had mutilated J.S.'s body. *Id*.

After Ms. Ferry entered her guilty plea and admitted to these facts, United States Magistrate Judge John F. Robbenhaar ordered Ms. Ferry to remain in custody pending sentencing. Doc. 232. Her sentencing is currently set for June 25 and 26, 2020. Doc. 244.

In the emergency motion now before the Court, Ms. Ferry asks the Court to revoke or amend the Detention Order [Doc. 232] and to release her under the condition that she remain in home confinement in the third-party custody of her mother in light of the COVID-19 pandemic.

Doc. 235 at 1. Ms. Ferry argues that the COVID-19 pandemic presents a changed circumstance which endangers her health, and that her release would be consistent with the approach taken in many other cases across the country in light of the pandemic. *See id.* at 2-7. She argues that she has performed "exceptionally well" on prior home detention [*Id*. at 7], and that her release is warranted due to the exceptional circumstances presented by the COVID-19 crisis. *See id*. at 13-16. Finally, she argues that her Due Process and Eighth Amendment rights would be violated by continued detention. *Id*. 8-13. The government opposes Ms. Ferry's request for release. *See generally* Doc. 239. For the reasons set forth below, the Court agrees with the government and is unconvinced by Ms. Ferry's arguments.

## DISCUSSION

I. The Court will not release Ms. Ferry under 18 U.S.C. § 3145(c).

The Court first finds that, although it has the authority to release Ms. Ferry pursuant to 18 U.S.C. § 3145(c) notwithstanding the "mandatory detention" provision of 18 U.S.C. § 3143(a)(2), it may do so only if Ms. Ferry demonstrates by clear and convincing evidence that she is not a flight risk or a danger to the community – a burden which she has not met.

The "mandatory detention" provision of 18 U.S.C. § 3143(a)(2) provides that a judicial officer "shall order that a person who has been found guilty of [certain offenses] and is awaiting imposition or execution of sentence be detained," unless there is a substantial likelihood that a motion for acquittal or new trial will be granted or the government has recommended that no sentence of imprisonment be imposed, *and* the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person in the community. 18 U.S.C. § 3143(a)(2). Ms. Ferry, having pled guilty to an offense for which the maximum sentence is life imprisonment or death, is subject to the "mandatory detention provision." *See id*.

(citing 18 U.S.C.A. § 3142(f)(1)). She does not suggest that there is a substantial likelihood that a motion for acquittal or for a new trial will be granted, and the government has recommended that a sentence of imprisonment be imposed.

However, notwithstanding the "mandatory detention" provision, a district court has the authority to order a person released if there is clear and convincing evidence that "the person is not likely to flee or pose a danger to the safety of any other person or the community," 18 U.S.C. § 3143(a)(1), and "it is clearly shown that there are exceptional reasons why such a person's detention would not be appropriate." 18 U.S.C. § 3145(c); *see also United States v. Jones*, 979 F.2d 804, 806 (10th Cir. 1992) (per curiam); *United States v. Ganadonegro*, No. 09-0312 JB, 2012 WL 1132166, at *8 (D.N.M. Apr. 4, 2012) (unreported) (citations omitted) (holding that, although 18 U.S.C. § 3145(c) is entitled "[a]ppeal from a release or detention order," a district court "may apply this subsection even when there is no appeal of a detention order.").

As such, the Court has the authority to release Ms. Ferry under 18 U.S.C. § 3145(c). However, in order to release her, the Court would have to find all three of the following: (i) clear and convincing evidence that she is not a flight risk; (ii) clear and convincing evidence that she does not pose a danger to the safety of any other person in the community; and (iii) exceptional reasons exist that make her detention inappropriate. *See Ganadonegro*, 2012 WL 1132166, at *5.

Ms. Ferry urges the Court to find that the COVID-19 crisis qualifies as an "exceptional reason" for release under 18 U.S.C. § 3145(c). *See* Doc. 235 at 13-15; Doc. 247 at 11-12. The government asks the Court to find the opposite. *See* Doc. 239 at 4-7; 13-16. However, the Court need not reach the issue of whether or not the COVID-19 pandemic qualifies as an "exceptional reason" under 18 U.S.C. § 3145(c) because even if the pandemic were an "exceptional reason," Ms. Ferry has not shown by clear and convincing evidence that she is neither a flight risk nor a

danger to the community.

Ms. Ferry's primary argument that she is neither a flight risk nor a danger to the community is that she has performed "exceptionally well" on prior home detention. Doc. 235 at 7. Specifically, the allegations that form the basis of the current indictment were previously charged in a state of New Mexico case. *Id.* As part of the state case, Ms. Ferry was released to home detention on September 22, 2017, and remained under the supervision of New Mexico pre-trial services personnel until her arrest in March of 2018 on the federal charges. *Id.* During the time that she was on home detention, she represents that she was compliant with the terms of her pre-trial conditions, maintained employment, and was productive. *Id.*

However, there are critical distinctions between the position in which Ms. Ferry found herself during her previous home detention and her present situation. During her prior home detention, Ms. Ferry was not yet facing federal charges. As things stand now, Ms. Ferry is not merely facing federal charges, but has pled guilty to those charges and has agreed to serve a term of 30 to 40 years in prison. *See* Doc. 229. As the government rightly notes in its response, Ms. Ferry's "guilty plea in this case, with an agreed upon sentence of not less than 30 years and not more than 40 years of incarceration, demonstrates the gravity of her conduct and makes her a serious risk of flight." Doc. 239 at 13. Ms. Ferry's compliance with home detention for a six-month period before she was federally indicted cannot negate the flight risk she now poses, having pled guilty to federal charges and facing a lengthy prison sentence.  Nor does the fact that she did not undertake any violent conduct during the limited time period during which she was on home detention negate the heinous and extremely violent nature of the conduct which gave rise to the offense, to which she has now admitted.

Accordingly, Ms. Ferry has failed to show by clear and convincing evidence that she is not

a flight risk and that she does not pose a danger to the community. Ms. Ferry's request for release

under 18 U.S.C. § 3145(c) will therefore be denied.

II. The provisions in 18 U.S.C. § 3142(i) do not apply to Ms. Ferry.

Ms. Ferry cites 18 U.S.C. § 3142(i) for the proposition that a "judicial officer may, by

subsequent order, permit the temporary release of the person, in the custody of a United States

marshal or another appropriate person, to the extent that the judicial officer determines such release

to be necessary for preparation of the person's defense or for another compelling reason." Doc.

235 at 8 (quoting 18 U.S.C. § 3142(i)). To the extent that Ms. Ferry is suggesting that she should

be released under this provision, that request is denied. Section 3142(i) applies to pretrial detainees

and as such is inapplicable to Ms. Ferry, who has already pled guilty and is held pursuant to §

3143, and accordingly can only be released upon a finding that she is not a flight risk or a danger

to the community.[2]

Finally, Ms. Ferry argues that she cannot visit easily with her attorney while in custody due

to the pandemic. Doc. 235 at 8. She argues that having access to her attorneys is "crucial to

effectively preparing" for her upcoming sentencing. *Id*. at 8. Although the Court recognizes Ms.

Ferry's right to access to counsel in order to prepare her defense, this alone – without a finding by

clear and convincing evidence that she is not a flight risk or a danger to the community – is not a

ground for release under 18 U.S.C. §§ 3143, 3145(c), or any other provision that would be

---

[2] Even if the Court did have the authority to release Ms. Ferry pursuant to § 3142(i), it would not exercise its discretion to do so. Courts in this district evaluate § 3142(i)'s "other compelling reason" standard in light of the COVID-19 outbreak using the following factors: (1) the original grounds for detention; (2) the specificity of the defendant's COVID-19 concerns and the immediate risk of infection; and (3) the efficacy of the proposed release plan in addressing the concerns of the Court when the original detention decision was made, as well as the COVID-19 risks now present. *See United States v. Sondergard*, 19-CR-4048 MV [Doc. 27 at *2] (D.N.M. Apr. 23, 2020) (unreported) (collecting cases). Here, the grounds for detention are that Ms. Ferry pled guilty to a heinous and violent offense with a maximum sentence of life imprisonment, leading to her mandatory detention pursuant to 18 U.S.C. §§ 3143. The specificity of her COVID-19 concerns is low, since she does not assert any enhanced vulnerability due to age or health conditions – rather, she is a healthy 22-year-old. And the proposed release plan does not assuage the Court's concerns about flight risk and danger to the community. *See Supra*, 5-7.

applicable to Ms. Ferry. Additionally, the Court cannot conclude that Ms. Ferry's current circumstances do not allow her sufficient access to her attorney to prepare for her upcoming sentencing, since Ms. Ferry has not provided the Court with specific information regarding her counsel's inability adequately to communicate with her.

III. Ms. Ferry's continued detention does not violate her Due Process rights.

Having declined to release Ms. Ferry under 18 U.S.C. § 3145(c) or 18 U.S.C. § 3142(i), the Court next turns to Ms. Ferry's constitutional arguments. Ms. Ferry's first constitutional argument is that her Due Process rights would be violated by continued detention. *See* Doc. 235 at 8-10. Specifically, she argues that "in light of the extreme risk to [her] health posed by the [COVID-19] virus and the ever-increasing likelihood that she will contract it if she remains housed under current conditions, the conditions of her confinement should be deemed punitive, in violation of the 5th Amendment." *Id*. at 10.

"The Supreme Court has instructed that claims involving conditions of confinement brought by pretrial detainees should be analyzed under the Due Process Clause of the Fourteenth Amendment rather than under the Eighth Amendment." *Sanders v. Hopkins*, 131 F.3d 152 (10th Cir. 1997) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 & n. 16 (1979)). In evaluating the constitutionality of conditions of pretrial detention under the Due Process Clause, the proper inquiry is "whether those conditions amount to the punishment of the detainee." *Wolfish*, 441 U.S. at 535. "[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Id*.

Ms. Ferry's Due Process claim fails for two reasons. First, having pled guilty, she is no longer a pretrial detainee protected from punitive detention. In her motion, she asserts – without citing any authority – that although she has already pled guilty, she "has not yet received a sentence

8

or final judgment in her case, and is entitled to the protections that must be afforded to pretrial detainees." Doc. 235 at 10. Yet the Tenth Circuit has specifically rejected the argument that someone who has pled guilty, but is awaiting sentencing, is entitled to the same Due Process protections as pretrial detainees. In *Berry v. City of Muskogee, Okl*., 900 F.2d 1489 (10th Cir. 1990), the plaintiff argued that a defendant awaiting sentencing should be treated as a pretrial detainee whose rights are governed by the Due Process Clause, rather than the Eighth Amendment. *Id*. at 1492. The Tenth Court rejected that argument, explaining:

> We see no reason to treat incarcerated persons whose guilt has been adjudicated formally but who await sentencing like pretrial detainees, who are detained primarily to ensure their presence at trial and who cannot be punished; and we perceive every reason to treat those awaiting sentencing the same as inmates already sentenced. The critical juncture is conviction, either after trial or, as here, by plea, at which point the state acquires the power to punish and the Eighth Amendment is implicated.

*Id*. at 1493 (internal citation omitted).

As such, Ms. Ferry's claim regarding the conditions of confinement would properly be analyzed under the Eighth Amendment. Since she has already pled guilty, she is no longer covered by the Due Process protections against punishment afforded to pretrial detainees.

Secondly, even if Ms. Ferry were protected from punishment as a pretrial detainee, her confinement would not violate her Due Process rights because it is not punitive in purpose. When evaluating conditions of pretrial detention, courts must decide whether a given condition is "imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Wolfish,* 441 U.S. at 538 (citation omitted). "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id*. at 539. "Conversely, if a restriction or condition is not reasonably related to a legitimate goal – if it is arbitrary or purposeless – a court permissibly

may infer that the purpose of the governmental action is punishment…" *Id.*

Ms. Ferry's confinement is related to legitimate objectives: to ensure her presence at her upcoming sentencing proceeding and to protect the public in light of the extremely violent nature of her conduct. The COVID-19 pandemic does not alter the legitimate purposes for which she is confined. Another court recently rejected a defendant's identical argument that his pretrial incarceration during the COVID-19 pandemic amounted to punishment and therefore violated the Fifth Amendment, instead finding that his "detention is reasonably related to legitimate government interests, namely, protecting the community and ensuring his appearance at trial." *United States v. David Cox*, No. 219CR00271RFBVCF, 2020 WL 1491180, at *6 (D. Nev. Mar. 27, 2020). As such, Ms. Ferry's Due Process argument is without merit.

## IV. Ms. Ferry's continued detention does not violate the Eighth Amendment.

Finally, the Court rejects Ms. Ferry's argument that her continued detention is in violation of the Eighth Amendment.

The Eighth Amendment protects against the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. Among other things, the Eighth Amendment requires that inmates be furnished with basic human needs, including "reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). "That the Eighth Amendment protects against future harm to inmates is not a novel proposition." *Savage v. Fallin*, 663 F. App'x 588, 592 (10th Cir. 2016) (quoting *McKinney*, 509 U.S. at 33). "Accordingly, courts may not 'deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.'" *Id.* (quoting *McKinney*, 509 U.S. at 33). "[A] remedy for unsafe conditions need not await a tragic event." *McKinney*, 509 U.S. at 33.

However, the Supreme Court has explained that only the "unnecessary *and wanton*

10

inflictlon of pain implicates the Eighth Amendment" – mere inadvertent failure to provide

adequate medical care does not. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (citation omitted)

(emphasis in original).

> After incarceration, only the unnecessary and wanton infliction of pain…
> constitutes cruel and unusual punishment forbidden by the Eighth Amendment. To
> be cruel and unusual punishment, conduct that does not purport to be punishment
> at all must involve more than ordinary lack of due care for the prisoner's interests
> or safety.... It is obduracy and wantonness, not inadvertence or error in good faith,
> that characterize the conduct prohibited by the Cruel and Unusual Punishments
> Clause, whether that conduct occurs in connection with establishing conditions of
> confinement, supplying medical needs, or restoring official control over a
> tumultuous cellblock.

*Id.* at 298-99 (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). In order to meet this standard,

prison officials must act with "deliberate indifference." *See Estelle v. Gamble*, 429 U.S. 97, 104

(1976) ("[D]eliberate indifference to serious medical needs of prisoners constitutes the

unnecessary and wanton infliction of pain"); *McKinney*, 509 U.S. at 33 (noting that prison

authorities may not be "deliberately indifferent" to conditions of confinement that are "sure or very

likely to cause serious illness and needless suffering the next week or month or year.").

"[E]xposure to contagious diseases may violate the Eighth Amendment if prison officials, acting

with deliberate indifference, expose a prisoner to a sufficiently substantial risk of serious damage

to his future health." *Loftin v. Dalessandri*, 3 F. App'x 658, 662 (10th Cir. 2001) (internal quotation

marks and citation omitted).

Ms. Ferry argues that her Eighth Amendment rights would be violated by her continued

detention due to the unreasonable risk of contracting COVID-19 and because she is in a facility

that is unable adequately to protect her from the virus. *Id.* at 11-13. To factually support her claim,

she provides arguments about COVID-19 in prison settings in general, as well as specifically in

Santa Fe County Adult Correctional Facility ("SFCACF"), where she is detained.

Regarding the risks of COVID-19 in custodial settings in general, she cites a journal article for the general proposition that conditions of pretrial confinement create the ideal environment for the transmission of contagious disease. *Id*. at 3 (citing Joseph A. Bick (2007) Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, at https:doi/org/10.1086/521910). She also argues that according to public health experts, infection control is challenging in detention settings and incarcerated individuals "may… be less able to participate in proactive measures to keep themselves safe." *Id*. (quoting "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020) at https://bit.ly/2W9V60S).

Regarding the facility where she is held, Ms. Ferry represents in her motion that SFCACF has quarantined at least one inmate due to the concern that he is carrying the virus. *Id*. at 5 (citation omitted). Then, in her reply, she represents that subsequent to her initial motion and the government's response, SFCACF confirmed its first inmate who tested positive for COVID-19. Doc. 247 at 3 (citing KOB4, Inmate Tests Positive for COVID-19 at Santa Fe Adult Correctional facility, at https://www.kob.com/albuquerque-news/inmate-tests-positive-for-covid-19-at-santa-fe-adult-correctional-facility/5699788//). She notes that this inmate was first tested for COVID-19 on March 28, 2020, and found to be negative, but after experiencing continued symptoms, was retested on April 7, 2020, and was found to be positive on April 12, 2020. *Id*.  She speculates that it is likely that the first test was a false negative, and argues that this "means that this inmate was in custody for almost two weeks acting under the belief that he was negative for the virus while he was, in fact, positive." *Id*.

She notes that as a way to slow the spread of the disease, New Mexico has implemented an order for social distancing that requires "maintaining at least six (6)-foot social distancing from

other individuals." Doc. 247 at 2 (quoting March 23, 2020 New Mexico Public Health Order, at

https://www.governor.state.nm.us/wp-content/uploads/2020/03/COVID-19-DOH-Order-fv.pdf).

She asserts that these measures are impossible to achieve within a detention facility. *Id*. Under

these conditions, she argues that her potential to become infected "is more than acute, it seems

nearly inevitable." Doc. 235 at 5.

In the COVID-19 context, a district court recently rejected a defendant's Fifth and Eighth

Amendment claims that he should be released due to the unsafe prison conditions created by the

coronavirus. *See United States v. Hartley James Lee*, No. 19-CR-298 (KBJ), 2020 WL 1541049,

at *5 (D.D.C. Mar. 30, 2020). The court reasoned that "COVID-19 presents undoubtedly serious

circumstances, but [the defendant] has not alleged that prison authorities have been deliberately

indifferent to this threat, and he would be hard pressed to do so, given the aggressive precautions

that DOC appears to have undertaken to prevent the spread of COVID-19 within its facilities." *Id*.

Likewise, here, the record does not support a finding that Ms. Ferry's conditions of

incarceration violate the Eighth Amendment, because Ms. Ferry has not alleged deliberate

indifference on the part of the prison officials, nor has she shown a "sufficiently substantial risk of

serious damage to [her] future health." *Loftin*, 3 F. App'x at 662. More specifically, Ms. Ferry has

failed to demonstrate that SFCACF has failed to take appropriate precautions to prevent the spread

of COVID-19, that it has not made a good-faith effort to implement such measures, or that it is

unprepared to care for inmates who may contract COVID-19. To the contrary, Santa Fe County

Corrections has taken concrete steps to prevent and mitigate the risks posed by COVID-19 to

inmates' health and safety. *See* Doc. 239 Ex. 1 (Santa Fe County Public Safety Plan-Corrections).

The county has identified a multi-phase plan to address the pandemic in  SFCACF. *See id*. Phase

one, the preventative phase, entails restricted movement, proactive daily and hourly cleaning,

cancellation of visitation, medical screening of all new inmates, onsite testing for inmates who present symptoms of COVID-19, action plans for intake housing and quarantine housing, and provisions for taking inmates to the emergency room for a higher level of care. *Id.* at 1-2. Specifically, all asymptomatic new inmates will be housed in separate intake pods apart from the existing population and will be secured in their cells for 7 to 14 days. *Id.* at 2. All inmates with presumptive and positive COVID-19 cases will be housed in designated quarantine pods for 14 days, will be monitored by officers every 30 minutes, and will be moved to the emergency room if medical staff determines a case is worsening. *Id.* Phase two, which addresses community spread, provides that if additional bed space is needed in light of the pandemic, female inmates will be relocated to another facility. *Id.* Phase three, which addresses exigent circumstances, provides for the implementation of cross training measures and for the contingency of staffing shortages. *Id.*

Ms. Ferry's complaint about the SFCACF inmate who initially tested negative for COVID-19 on March 28, 2020, but was retested on April 7, 2020 and was then found to be positive for the virus, does not suggest deliberate indifference on the part of prison officials. On the contrary, the fact that the facility not only tested this inmate once, but then re-tested him after his symptoms continued, suggests that the facility is taking adequate measures and precautions. Ms. Ferry does not suggest that the negative test result, which she presumes was likely a false negative, was somehow the fault of the facility, much less that it was "obduracy and wantonness, not inadvertence or error in good faith." *Wilson v. Seiter*, 501 U.S. at 299 (citation omitted).

The Court further finds that Ms. Ferry has not identified a "sufficiently substantial risk of serious damage to [her] future health." *Loftin*, 3 F. App'x at 662. Ms. Ferry notes in her motion that the Center for Disease Control "has issued guidance that individuals at higher risk of contracting COVID-19 – adults over 60 years old and people with chronic medical conditions such

as lung disease, heart disease, and diabetes – take immediate preventative actions, including avoiding crowded areas and staying home as much as possible." Doc. 235 at 3 (citing *People at Risk for Serious Illness from COVID-19*, CDC (March 12, 2020) at https://bit.ly/2vgUt1P). Yet Ms. Ferry does not assert that any of these increased vulnerabilities apply to her. She is 22 years old, and the Court does not have any information before it to suggest that she is not in good physical health. Ultimately, there is nothing to suggest that Ms. Ferry's health or age place her at high risk to experience severe illness if she contracts the virus.

Ms. Ferry argues in her reply that "no plan can change the reality that the social distancing that has been the hallmark of COVID-19 prevention efforts around the world is simply not possible in [a custodial] setting." Doc. 247 at 4. This, she argues, is due to "[t]he inherent features of detention facilities, including 'overcrowding, population density in close confinement, insufficient ventilation, shared toilets, showers, and eating environments and limited availability of hygiene and personal protective equipment such as masks and gloves…'" Doc. 247 at 4 (quoting Doc. 247, Ex. A at 1) (Medical and Public Health School Faculty COVID-19 Letter). Ms. Ferry provides two exhibits to support her claim: a letter to the Governor of Maryland signed by faculty members from the Johns Hopkins Bloomberg School of Public Health, School of Nursing, and School of Medicine regarding the spread of COVID-19 in Maryland's prisons, jails and juvenile centers [Doc. 247 Ex. A], and the Declaration of Dr. Jamie Meyer, an Assistant Professor at Yale School of Medicine and Assistant Clinical Professor of Nursing at Yale School of Nursing, regarding the heightened risk of epidemics generally – and COVID-19 specifically – in prison settings generally, and in the Federal Bureau of Prisons Facilities in Danbury, Connecticut specifically [Doc. 247 Ex. B]. These exhibits establish – and the Court does not wish to undermine – the risk of COVID-19

15

spreading in jail and prison settings. But this generalized risk cannot form a basis for the Court to find that Ms. Ferry's Eighth Amendment rights are being violated.[3]

## CONCLUSION

For the reasons set forth above, the Court finds that there is no valid reason to release Ms. Ferry to home confinement pending sentencing. Ms. Ferry has cited and discussed many cases in which other courts have released defendants due in whole or in part to the COVID-19 pandemic. The government, in turn, has brought the Court's attention to numerous cases in which courts have denied defendants release on the basis of the pandemic. What characterizes the vast majority of these cases is the highly individualized and case-specific nature of the inquiry. In Ms. Ferry's case, given the lack of any personal risk factors that would make her unusually vulnerable to COVID-19, the extremely violent and depraved nature of the conduct to which she pled guilty, and the lengthy sentence that awaits her, release is unjustified. There is no set of conditions of release that can adequately mitigate the risks of flight and danger to the public. While the Court is aware of the seriousness of the COVID-19 pandemic and the health risks associated therewith, the pandemic cannot be the sole basis for releasing a defendant from custody when other factors do not support release.

**IT IS THEREFORE ORDERED** that Ms. Ferry's Emergency Motion for Revocation or Amendment of Order of Detention [Doc. 235] is **DENIED**.

---

[3] The exhibits do not suggest that there are no measures that can be taken to mitigate the risks of COVID-19 in custodial settings. In fact, the "Medical and Public Health School Faculty COVID-19 Letter" lists proactive steps that facilities can take, including making their plans for prevention and management of COVID-19 in their institutions publicly available, ensuring that intake screening protocols are updated to include COVID-specific questions, and arranging for COVID-19 testing of incarcerated individuals and correctional facility workers who become ill. Doc. 247 Ex. A at 2-3. It appears that the facility where Ms. Ferry is in custody has taken steps towards implementing similar measures. *See* Doc. 239 Ex. 1 (Santa Fe County Public Safety Plan-Corrections).

Dated this 6th day of May, 2020.

MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE

Donald Kochersberger                 Elaine Y. Ramirez
Thomas M. Clark                      Margaret M. Vierbuchen
*Attorneys for Ms. Ferry*            *Assistant United States Attorneys*